**PEASE LAW, APC**
Bryan W. Pease (SBN 239139)
3960 W. Point Loma Blvd., Suite H-2562
San Diego, CA 92110
Ph. (619) 723-0369
Email: bryan@peaselaw.org

**LAW OFFICES OF G. DAVID TENENBAUM**
G. David Tenenbaum (SBN 150629)
269 S. Beverly Drive #1041
Beverly Hills, CA 90212
Ph. (312) 404-7723
Email: g.davidtenenbaum@gmail.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| DILEY GREISER and CHELSEA WARD, <br><br> Plaintiffs, <br> v. <br><br> JOHNNY CHAVEZ, CARMEN SANCHEZ, SAMANTHA AFFLECK, KEVIN FERBER, JOHN PARKS, JOSHUA ALEXANDER, JOSH GUERRY, FRANK HARDIN, TROY MOORADIAN, and DOES 1-10, <br><br> Defendants. | Case No. <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |
|---|---|

1
COMPLAINT

## JURISDICTION AND VENUE

1. This action arises under 42 U.S.C. § 1983. The Court has jurisdiction pursuant to 28 U.S.C. §1331 and §1343.

2. Venue under 28 U.S.C. § 1391 in this Court is proper as a substantial part of the events or omissions giving rise to the claims alleged occurred in San Bernardino County, which is within the Central District of California. Additionally, all Defendants reside in San Bernardino County.

## PARTIES

3. Plaintiff DILEY GREISER is an individual residing in San Bernardino County. Greiser is a recently retired firefighter who volunteers much of her time rescuing animals and working with various animal rescue organizations, including one that she runs herself as a volunteer.

4. Plaintiff CHELSEA WARD is an individual residing in Nevada and is the co-founder of Southern Nevada Animal Rescue ("SNARL"), a 501(c)(3) nonprofit animal rescue organization that she and her husband run as volunteers.

5. Defendant JOHN PARKS is an individual residing in San Bernardino County.

6. Defendant JOHNNY CHAVEZ is an individual residing in San Bernardino County.

7. Defendant CARMEN SANCHEZ is an individual residing in San Bernardino County.

8. Defendant KEVIN FERBER is an individual residing in San Bernardino County.

9. Defendant SAMANTHA AFFLECK is an individual residing in San Bernardino County.

10. Defendant JOSHUA ALEXANDER is an individual residing in San Bernardino County.

11. Defendant JOSH GUERRY is an individual residing in San Bernardino County.

12. Defendant FRANK HARDIN is an individual residing in San Bernardino County.

13. Defendant TROY MOORADIAN is an individual residing in San Bernardino County.

14. Plaintiffs are informed and believe and thereon allege that each of the fictitiously named DOE Defendants is responsible in some manner for the acts, omissions, and damages alleged herein. Plaintiffs are unaware of the true names and capacities of the DOE Defendants, and, therefore, sues these Defendants under such fictitious names. Plaintiffs are informed and believe and thereon alleges that each of said fictitiously named Defendants was the agent, servant and employee of each and every other Defendant acting within the course and scope of his or her agency and employment, and with the knowledge, ratification and consent of each respective principal. Plaintiffs will seek leave to amend this Complaint when their true names and capacities have been ascertained.

15. Regarding all actions and causes of action herein alleged and stated, all Defendants (including all DOE defendants) violated clearly established statutory or constitutional rights held by Plaintiffs that they had a mandatory duty to uphold. No reasonable governmental official similarly situated to any of the Defendants could have believed that his/her conduct was lawful or within the bounds of reasonable discretion. As a result, all individual Defendants, including all individual DOE defendants, lack immunity from suit or liability under either statutorily created immunity or the judicially created doctrine of "qualified immunity".

**ALLEGATIONS OF FACT**

16. On either Friday August 7, or Saturday August 8, 2020, San Bernardino County Sheriff's Sergeant Gary Hart was contacted by his sister-in-law, a witness who while riding off-road vehicles saw dogs in the desert outside of Hinkley, "in makeshift

shelters with no shade, food, or water." There was no address, so the witness provided GPS coordinates. The witness first called San Bernardino County Animal Control, but they refused to respond without a physical address, and said they would not use GPS coordinates.

17. On August 8, 2020, Sgt. Hart emailed the Barstow Sheriff's station watch commander and desert dispatch supervisor what the witness, who wished to remain anonymous, had told him.

18. The same day, Deputies Kelsey Parsons, Joshua Alexander, Walter Kazee, and Sgt. Frank Hardin went to the location, which was determined to be 46402 Hoffman Rd., Hinkley, CA, and initiated an animal cruelty investigation. There was a wooden shed with a table and umbrella, a metal shed, and a pop-up tent in the middle of the property. There were wire cages, which held approximately 63 German Shepherds. The cages varied in size, and some were covered with tarps and boards. Some of the cages did not have any shade coverings. When deputies arrived on scene, they observed empty water bowls with dirt stuck to the bottom of the bowls. Several dogs were on chains that were connected to metal stakes. The outside temperature was over 100 degrees.

19. Alexander believed the land to belong to the Bureau of Land Management (BLM). He observed most of the water bowls were turned upside down, and the ones that were right side up had no water in them. In the cages with no shade, the dogs had dug holes to escape the sun.

20. After the deputies arrived, San Bernardino County Animal Control Officer (ACO) Johnny Chavez responded to the location to assist the deputies. Chavez falsely claimed in his report the "dogs were provided shade by the shade cloths," even though many of the cages did not have any shade, and that "there were water bowls in their cages with water." The deputies explained that they had put the water there, and the dogs previously had no water, but this did not change Chavez's assessment.

21. The deputies arrested Alla Zorikova and Olivia Jeong on animal cruelty charges and asked Chavez to seize the animals, but he refused. Chavez called his

supervisor, ACO Lt. Carmen Sanchez, who said that "based on past practice, it was common for ACOs to leave animals at the scene when a subject was arrested, unless the animals needed immediate care from a veterinarian," which Chavez claimed the dogs did not.

22. Chavez did seize 12 puppies found in a box in a makeshift shed on the property, which appeared to be a few days old. Chavez asked Zorikova which dog was the mother, but Zorikova refused to answer. Animal Control then inexplicably euthanized all 12 puppies, claiming they did not have the means to bottle feed them.

23. Sgt. Hardin yelled at Sanchez on the phone and said animal control needed to "take action now" to remove the dogs, but Sanchez refused.

24. On August 9, 2020, Hardin instructed Parsons to take food and water to the property for the dogs. Parsons told Hardin she contacted a rescue center who was going to the location to provide food for the dogs. Hardin says he told Parsons she could not take the dogs or give them to anyone without authorization from an ACO. Hardin claimed they had "no jurisdiction" to take the animals, and no means to care for them. Hardin contacted Lt. Kevin Ferber to inform him of the situation.

25. Also on August 9, 2020, ACO Affleck was assigned by animal control to provide food and water to the dogs still left on the property. Affleck noted that some of the dogs "were not appropriately tethered, which prevented them from getting adequate shade." She claimed none of the dogs "appeared to be in distress," yet she contradictorily noted "two to three dogs were spinning in circles," which she attributed to "neurological issues," without any further detail, explanation, or veterinarian report.

26. Sheriff's deputies had contacted various animal rescuers in the community to come help the dogs. Deputy Kelsey Parsons was a point of contact for some of these rescuers, one of which put Diley Greiser in touch with Parsons, who confirmed that there were dogs abandoned in the desert needing help. Greiser then organized animal rescue efforts, including contacting Chelsea Ward, who runs a rescue in Las Vegas, to be able to help care for and adopt out some of the dogs.

27. On August 10, 2020, Affleck and other ACOs arrived again at the scene, but she noted only 25 dogs remained on the property. They impounded these remaining dogs. Deputy Alexander discussed with ACO Affleck discovering a Facebook post about rescuing dogs abandoned in the desert. Affleck took two of the dogs to a veterinarian "because she believed they suffered from neurological issues." One of these dogs was euthanized at the veterinary hospital.

28. Yet, Affleck claimed the criteria for Penal Code § 597 was not met in this case, because the dogs "appeared to be healthy and had food and water when ACO arrived."

29. On August 10, 2020 at around 4:00 p.m., Ward received an email from Deputy Alexander stating, "My name is Deputy J. Alexander and I'm from the San Bernardino County Sheriff's Office, Barstow Station. Recently my station came apon [sic] a property with a large number of German Sheppards [sic]. Some of the dogs have been taken away and it was brought to our attention SNARL May [sic] have been involved. When you get a chance I'd like to speak with you about it if you have any information. At your convenience call 760-256-4846 and ask for me."

30. Ward called Deputy Alexander back as soon as she saw this email, and emailed him at 4:49 p.m. stating she had just tried calling. He then called Ward back around 6:00 p.m. and asked Ward to email him a statement, which Ward did.

31. In their conversation, Deputy Alexander stated there was a risk the owners of the dogs, who were at the time incarcerated, may request to reclaim these dogs when they are released from jail. In their phone discussion and as Ward stated again in her email, she asked Deputy Alexander if it was okay to proceed with providing basic medical care and vetting for the dogs, and he stated that it was a "weird situation" because the owners may try to reclaim the dogs, but if Ward felt the need to provide medical care for the dogs, he "couldn't advise you not to."

32. As discussed on the phone with Deputy Alexander and again in her email, Ward stated her rescue group, SNARL, would proceed with vetting these dogs as

deemed required by Clark County Law. This vetting included, but was not limited to: Vaccines (DAPP2, Bordatella, and Rabies) and alteration procedures. Ward advised Deputy Alexander that in the event that the dogs required additional medical attention due to upper respiratory infections, internal or external parasites, ear and eye infections, diarrhea or vomiting, common skin disorders, urinary track infections, etc., SNARL would also have their vets treat as necessary, and that they would provide basic housing and grooming services while the dogs were in their care.

33. In this conversation and in Ward's email, Ward also discussed that SNARL would be putting a hold on these dogs' adoptions pending the completion of the animal cruelty investigation or any hearing. Deputy Alexander stated on their call that he would be in touch with her sometime the following week if he needed anything additional from Ward. Ward advised Deputy Alexander by phone and in the email that if SNARL did not hear back from him within the next two weeks, SNARL would assume they were clear to proceed with finding adoptive homes for the 23 dogs that were transported back to Las Vegas.

34. Ward also advised Deputy Alexander by phone and in her email that if there was anything additional she could provide to him to please let her know. Ward stated she was happy to provide medical documentation for the dogs, photos, etc., and that his team was welcome to come out and visit if needed as well.

35. On August 11, 2020, Deputy Alexander responded to Ward, "Thank you very much for email. I haven't heard anything new but when I do I will let you know."

36. Ward wrote back the same day, "Sounds good. Do you by chance know which shelter the remaining dogs were taken to? We would like to follow them if possible and potentially pull them once they are clear."

37. Deputy Alexander never wrote back.

38. Also on August 11, 2020, Deputy District Attorney Emily Williams wrote a short memo declining to file animal cruelty charges against Zorikova and Jeong, stating this decision was due only to "further investigation" being needed.

39. Thus, there was never a determination by the DA's office that the dogs had not been neglected or subjected to cruel and illegal conditions. Rather, the DA's office asked law enforcement to obtain more information. But, because San Bernardino County Animal Control refused to do its job, such information never became available.

40. Also on August 11, 2020, Zorikova and Jeong were released from jail and returned to the property. They found two dead dogs on the property, which they believed "ACO missed when they impounded the 24 dogs," which further shows the gross negligence and reckless disregard for the welfare of the dogs by ACO defendants.

41. Zorikova then retrieved 25 of her dogs from Animal Control, which also told her that SNARL was known to be in possession of other dogs. Defendant animal control officers also provided private information and details about Ward and other animal rescuers to Zorikova.

42. Zorikova and her attorney at the time, John Levine, then began a nonstop harassment campaign against SNARL and their attorney Casey Gish, as well as other rescues, including calling at all hours of the night, and sending threatening emails constantly, stating that Zorikova had been released, no animal cruelty charges were filed, and demanding to take possession of the dogs. Zorikova even showed up in person at Attorney Gish's doggie daycare center pretending to be a customer and snooping around.

43. By this time SNARL had spent significant funds on veterinary care for these dogs, who had multiple serious health conditions. SNARL had received no further communication from the San Bernardino Sheriff's Department, so on August 14, 2020, Ward wrote again to Deputy Alexander:

> Can you share with me the details of the arraignment from the District Attorney's office? Like the determination letter showing why the alleged owners were released after arraignment?
> We would like to potentially pursue pressing criminal charges against the people who are claiming to own the dogs in our care as the shape they are in is poor. One was rushed into emergency

> surgery last night because she had pyometra.
>
> Can you provide me with a contact for Animal Control or any paperwork we need to have our vets complete to provide proof of the animal's conditions?

44. Deputy Alexander never responded to this email either. Ward called the Sheriff's Department at least four times after that and left messages with no response.

45. Deputy Parsons' August 15, 2020 report stated:

> As previously stated in the original report, all animals appeared to have matted fur, dehydrated and hungry. Animals were panting severely. I gave the dogs water and most finished the water quickly as if they had not had water in a while, others gagged at drinking so much water so fast. Some dogs prior to giving them water paced back and forth by the dish in their pen, whether it was for water or food is unknown.
>
> Most of the dogs appeared to be hungry by their behaviors of nudging their bowls/buckets/plates and pacing by them. My own observations about the dogs, I saw they had matted fur and were desperate for shade and water. Many appeared lethargic and did not have the proper sustenance to function, as if they had heat stroke or malnourished. Could possibly be due to the extreme weather and heat conditions with no shelter, water or food. It was unknown when the last time the animals were fed since no food was located anywhere on the property.
>
> Most of the containers in the dog pens had hardened dirt/sand on them with no moisture whatsoever. This was evident the dogs had not been watered for quite some time. There was a lack of feces in the pens as well, and no disposal site was found on the property for the feces. This led me to believe the dogs were eating their own feces since they were not being properly fed, if at all. Along with lack of food and water this could lead to medical problems for the dogs. Which will be addressed by a vet coordinated through Animal Control.
>
> As stated in the original report temperatures had been well over 100 degrees, at the day of arrest temperatures were approximately 105 degrees with occasional gusts of wind. Due to the surroundings there were no natural barriers, such as mountains, canyons etc. to block the

elements at the location. The location was flat desert terrain. With wind gusts that can be over 20 mph, pelting sand with it.

At the time of the report/arrest it was midday, with the sun directly overhead and moving to the west. As stated previously there were no natural barriers to block the elements. The structures which were in place for the animals were tattered sheets and were not placed in a way to provide shade or shelter. Some of the pens had small objects balanced on the corner of the hog wire pens, also not providing any shade or shelter and most appeared to be knocked off by the dogs or elements.

Because of an Animal Controls policy not being able to take control of the animals for 48 hours, I was not able to obtain veterinary information on any of the animals prior to the suspects arraignments. The original tag placed by Officer Chavez at the scene was noted the animals would be seized within 24 hours. However, Chavez, Afleck and Molina all advised the animals would not be seized till after 48 hours.

In regard to the 12-puppy's [sic] animal control officer Chavez seized. He explained because the suspects, Zorikova and Jeong, were not cooperative by refusing to identify the mothers to the puppies, he could not reunite the puppies to the mothers for nursing. He advised if rescuer(s) were not available to take the nursing puppies, he would seize them and euthanize them. The puppies appeared hungry since they were whimpering loudly. They did not have any circulating air in the small closed up cardboard boxes, with the flaps of the boxes closed in. No puppy formula or bottles were located at the scene. I explained to Chavez I could locate rescues/volunteers to help with the puppies, I had to transport the suspects to jail first and would contact him. Once I was done booking the suspects into jail, Chavez was contacted, and he said the puppies were euthanized.

46. On August 19, 2020, Zorikova filed a dog theft report. Deputy Alexander took the report. As the report was initiated through Deputy Alexander, all Defendants who participated in the sham theft investigation were aware of the details also known by Deputy Alexander.

47. On August 31, 2020, Detective Grimm finally called Ward back. Ward had been working with attorney Casey Gish to provide documentation to the District

Attorney for the animal cruelty investigation of Zorikova and to take action against the nonstop harassment from Zorikova and Levine, and Ward asked to have Gish included in the call.

48. Later that same day, Gish sent a letter with extensive documentation including SNARL's veterinarian records from the rescued dogs, and photos and videos of the conditions they had been in when other rescues removed them from the property, to the district attorney, and copied Grimm on the email as Grimm had requested.

49. On September 1, 2020, Zorikova's attorney provided a "report" to Grimm regarding which rescues he believed had the dogs. The same day, a woman named Jennifer Fuller who had allegedly been involved in a Facebook messenger group about rescuing the dogs called the Sheriff's Department and spoke with Grimm, and gave him a copy of the Facebook discussion, which talked about law enforcement being involved in the rescue of the dogs, but the participants not wanting word to spread too far due to animal control being hostile and just wanting to euthanize all the dogs.

50. On September 9, 2020, Grimm searched Greiser's home with Detective Parks and seized her phones and electronic devices. All Defendants were aware this search warrant was based on false and misleading information, yet ordered the search to proceed anyway, in order to cover up the County's failure to provide care for the abandoned dogs which had been rescued from cruel and unlawful conditions, and instead pursue the fiction that the dogs were in lawful conditions and had been "stolen."

51. On September 10, 2020, Grimm arrived at Ward's home with a search warrant executed by Las Vegas Police. All Defendants were aware this search warrant was based on false and misleading information, yet ordered the search to proceed anyway, in order to cover up the County's failure to provide care for the abandoned dogs which had been rescued from cruel and unlawful conditions, and instead pursue the fiction that the dogs were in lawful conditions and had been "stolen."

52. On September 14, 2020, Defendant John Parks authored a search warrant for call detail records and subscriber information for the cellphone number of Diley

1  Greiser, which he obtained with false and misleading statements and by omitting key
2  facts. This unlawful search revealed calls between Greiser and Deputy Parsons on the
3  day dogs were rescued from the vacant land in the desert.

4    53.   On October 7, 2020, Detective Guerry authored a search warrant to require
5  Facebook to turn over all data on Chelsea Ward, in which he included false and
6  misleading information in the warrant affidavit and omitted key facts.

## FIRST CAUSE OF ACTION
## 42 U.S.C. § 1983

54.   Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint as though each were set forth herein in full.

55.   Defendant JOHN PARKS was at all times aware that Plaintiff Diley Greiser had committed no crime and that the search warrant authored by Detective Grimm contained false and misleading information, including omitting key facts. Yet, Parks still participated in the unlawful search of Greiser's residence. Thereafter, Parks authored a search warrant for Greiser's call detail records that contained additional false and misleading information and omitted key facts.

56.   Defendants JOHNNY CHAVEZ, CARMEN SANCHEZ, and SAMANTHA AFFLECK are animal control officers who conspired to violate Plaintiffs' Fourth and Fourteenth Amendment rights to cover up the animal cruelty committed by Zorikova and their own failure and refusal to provide the required care for the dogs.

57.   Defendant KEVIN FERBER is a sheriff's lieutenant who at all times was aware of the facts and circumstances surrounding the Zorikova investigation, yet directed the violation of Plaintiffs' Fourth Amendment rights through unlawful searches and seizures based on a sham theft investigation, to cover up the animal cruelty committed by Zorikova and the ACO defendants' failure and refusal to provide the required care for the dogs.

58.   Defendant TROY MOORADIAN is a sheriff's sergeant who at all times was aware of the facts and circumstances surrounding the Zorikova investigation, yet

directed the violation of Plaintiffs' Fourth Amendment rights through unlawful searches and seizures based on a sham theft investigation, to cover up the animal cruelty committed by Zorikova and the ACO defendants' failure and refusal to provide the required care for the dogs.

59. Defendant JOSHUA ALEXANDER is a sheriff's deputy who participated in the initial animal cruelty investigation of Zorikova and specifically authorized Ward to adopt out the dogs, yet conspired in the violation of Plaintiffs' Fourth Amendment rights through unlawful searches and seizures, to cover up the animal cruelty committed by Zorikova and the ACO defendants' failure and refusal to provide the required care for the dogs.

60. Defendant JOSH GUERRY was a sheriff's detective who made the decision to hold onto Plaintiff Greiser's improperly seized property for several months despite there being no reasonable basis to continue holding onto this property, including for months after the District Attorney issued a decline to charge letter, thus violating Plaintiff Greiser's Fourth Amendment rights.

61. Defendant FRANK HARDIN is a sheriff's sergeant who at all times was aware of the facts and circumstances surrounding the Zorikova investigation, yet directed the violation of Plaintiffs' Fourth Amendment rights through unlawful searches and seizures based on a sham theft investigation, to cover up the animal cruelty committed by Zorikova and ACO defendants' failure and refusal to provide the required care for the dogs.

62. Defendants, individually and collectively, and at all times acting as accomplices of each other, deprived Plaintiffs of their Constitutional rights guaranteed to them by the Fourth Amendment to be free from unreasonable searches and seizures and by the Fourteenth Amendment to substantive due process and equal protection of the laws.

63. At no time did Plaintiffs give consent to Defendants' actions.

64. In committing the acts and omissions alleged herein, Defendants acted

under the color of state law.

65. In committing the acts and omissions alleged herein, Defendants acted with malice, oppression and fraud, and with the intent to cause harm and/or offense to Plaintiffs.

66. Accordingly, Plaintiffs are entitled to compensatory damages, punitive damages, attorney fees under 42 U.S.C. § 1988, and all applicable law, and any other such relief as the Court deems just and appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

(1) For general and special compensatory damages (including direct, indirect, and emotional damages), and punitive damages, in amounts to be determined by the trier of fact, against all Defendants.

(2) For reasonable attorney's fees and costs and expenses of litigation, pursuant to United States Code §§ 1983-1988, and any other relevant statutory or case law, against all Defendants.

(3) For such other and further legal and equitable relief as the Court deems just and proper.

Dated: September 9, 2022     By:   /s/ Bryan W. Pease
                                   Bryan W. Pease
                                   Attorney for Plaintiffs

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury as to each and every legal cause of action against each and every defendant.

Dated: September 9, 2022     By:   /s/ Bryan Pease
                                   Bryan W. Pease
                                   Attorney for Plaintiff